# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-00643-COA

| | |
|---|---|
| JAMES RICHARDS | APPELLANT |

v.

| | |
|---|---|
| MISSISSIPPI DEPARTMENT OF PUBLIC SAFETY | APPELLEE |

DATE OF JUDGMENT:   03/11/2019
TRIAL JUDGE:    HON. ELEANOR JOHNSON PETERSON
COURT FROM WHICH APPEALED: HINDS COUNTY CIRCUIT COURT,
           FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:  R. SHANE McLAUGHLIN
ATTORNEY FOR APPELLEE:   M. ERIC BROWN
NATURE OF THE CASE:   CIVIL - STATE BOARDS AND AGENCIES
DISPOSITION:     AFFIRMED - 11/17/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE BARNES, C.J., McDONALD AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1. An agency terminated a highway patrolman after he reported to work heavily impaired by a near-lethal combination of multiple controlled substances. The patrolman appealed his termination on the basis that he was legally prescribed each of the substances.

¶2. A hearing officer of the Employee Appeals Board (EAB) and later the full EAB reversed the patrolman's termination and ordered his reinstatement. The agency then appealed to circuit court. Following the agency's appeal to circuit court, the officer's termination was reinstated because substantial evidence supported the agency's decision. We

1

affirm.

## FACTS AND PROCEDURAL HISTORY

¶3.     James Richards was employed as a state trooper for the Mississippi Highway Patrol (MHP).  From 2010 until his termination in 2016, the agency received several reports referencing suspicions that Richards was under the influence of drugs. The record reflects nearly twenty employee counseling records, evaluation sheets, and other written reports that document a variety of concerns about Richards' behavior during that period.

¶4.     Several of the records address Richards' questionable demeanor while on-duty.  For example, the trooper would often sweat profusely, slur his speech when he talked, walk unsteadily, and appear to have a "short attention span" when he communicated with his superiors.  His peers described his eyes as "watery" and "red" and noted that he seemed "inebriated" and "lost" on many occasions.  Other records documented Richards' habit of conveying thoughts of suicide and flagged other instances of erratic behavior, such as kicking down his own bedroom door while his wife was inside. Troublingly, on one occasion, the trooper failed to report to an accident where the "threat of loss of life was present."

¶5.     Richards' behavior also sparked concerns from the citizens he was sworn to protect. One individual reported to MHP that an officer, later identified as Richards, was drifting in and out of the lane next to him while driving his patrol car on a rainy night.  According to the report, the trooper would reduce the speed of his car to about 25 mph and suddenly increase speed to 45 mph.  His brake lights flashed on and off to indicate that he was braking and

accelerating sporadically. The person who reported the incident thought that the trooper behind the wheel may have been "falling asleep" or was experiencing "heart failure."

¶6.    Additionally, a business-owner stated that Richards was behaving strangely one day when he entered her dry-cleaners to get his uniform cleaned. Richards had driven to the establishment in his patrol car and "had someone in the car with him." The business-owner noted that Richards' eyes were dilated, his speech was slurred, and he had to "brace" himself on the counter to prevent himself from falling. He had also spoken to her personally about his thoughts of suicide and relationship issues.

¶7.    One layperson who had walked by and communicated with Richards at a hospital one night reported to MHP that the trooper behaved as if he were "under the influence."[1] The citizen described Richards as "incoherent," "confused," and walking unsteadily.

¶8.    In addition to these citizens' reports, other reports about Richards expressed general concerns that he was potentially using drugs and needed to be drug-tested due to his condition and behavior. When MHP finally confronted the trooper about whether he was taking any type of medication, he replied that aside from enjoying "a beer every once in a while," he was not taking any drugs. On several occasions, MHP offered Richards assistance in dealing with what seemed to be a growing problem. But in each instance, he declined and insisted that he was "fine."

*The Incident at the Shooting Range*

---

[1] Richards was off-duty on this particular night.

3

¶9.    An incident in 2016 would finally prompt MHP to fully investigate its suspicions regarding Richards' potential drug use.  At the very beginning of November, Richards was required to complete an in-service training program where he would receive classroom instruction and complete firearm qualifications.

¶10.    Master Sergeant Lonnie Griffin of MHP testified that at the firing range, Richards appeared to move in "slow motion" and was excessively sweating "when no one else was." Although Richards qualified to use his firearms by passing the test administered at the shooting range, Sergeant Griffin testified that Richards was "unsteady."  He explained that someone at the range had to assist Richards during the process by helping him reload magazines and keep up with the speed for re-firing the guns.  Sergeant Griffin further testified that Richards had issues with "weapon jams" and had to be constantly "coached" through the process of his firearm qualification.

¶11.    Phillip Hemphill, MHP's range director, corroborated Sergeant Griffin's testimony in a written statement by painting a similar picture of Richards' behavior while on the firing range.  Hemphill stated the trooper was "sweating profusely," "very unsteady in his walk," "sway[ing] back and forth" at times, and slurring his speech. According to Hemphill, Richards appeared "disoriented" and "confused."

¶12.    The strangest account of Richard's behavior depicted the trooper placing a towel on the ground, getting on his knees "like a dog" and rubbing his face back and forth on the towel rather than simply lifting the towel to wipe his face.  Hemphill further stated that Richards

4

appeared to be "in another world."

¶13.     In his written statement, Trooper Jason Ball also noticed Richards' behavior at the shooting range and brought the situation to Sergeant Griffin's attention.  Additionally, Trooper Anthony Granderson reported Richard's behavior and similarly noted his slurred speech and excessive sweating on the fall day.  Richards' finger had also been badly injured that day, but he "showed no regards to it."

*Richards' Visit to the Forensics Laboratory*

¶14.     After Richard's bizarre behavior unfolded at the shooting range, Captain Malachai Sanders instructed Sergeant Griffin to take the trooper to the Mississippi Forensics Laboratory. The captain wanted Richards drug-tested.

¶15.     According to the sergeant, Richards declared during the ride that "his job and career [were] over" and went on to state that he wanted to resign from his position as a highway patrolman.  After expressing these concerns, Richards took a nap in the patrol car on the way to the crime laboratory.  When they arrived at the laboratory, Sergeant Griffin noted that Richards became "visibly upset" and "began to cry."

¶16.     After signing a consent form and being asked what medication he had taken for the day, Richards informed the test administrator that he had taken the painkiller Lortab.  The trooper then submitted his urine sample.  Sergeant Griffin proceeded to secure Richards' weapons and had his patrol car transported because he was "too impaired to drive."

¶17.     That same day, Richards met with Lieutenant Charles Coleman and Captain Sanders.

5

During the conversation, he informed Lieutenant Coleman that he had "only" taken Adderall the night before training. The trooper later changed his statement and admitted to taking a Lortab in addition to Adderall on the morning of training. Richards explained to Lieutenant Coleman that he took Adderall to focus better. He further admitted to taking the additional medication to alleviate hip, shoulder, and ear pain that he allegedly suffered due to a major car accident.

¶18. Lieutenant Coleman later drafted a report about Richards' behavior, noting that the trooper appeared to be "very incoherent and unresponsive while speaking." He also noted that Richards' "speech was slurred," and his face was "flushed red." Likewise, Captain Sanders reported that when he asked the trooper what had happened that day that caused others to believe he was under the influence of drugs, he was disoriented and just "stared at the floor."

¶19. MHP offered Richards assistance through a rehabilitation program, but he declined. MHP then decided to place him on administrative leave to "work through" any problems he had.

*Richards' Positive Test Results for a Variety of Controlled Substances*

¶20. In the meantime, Richards' drug test returned from the crime laboratory. The test checked for both the presence of drugs and their recent use, as shown by metabolites. Specifically, the test revealed four drugs, in addition to the drugs' metabolites, that were present in his system the morning of the qualification at the shooting range. He tested

6

positive for alprazolam, and the metabolized by-product of it, alpha-hydroxyalprozalem, hydrocodone, and its metabolites, dihydrocodeine and hydromorphone, oxycodone and its metabolite, oxymorphone, and amphetamine, along with its metabolite, phenylpropanolamine.

¶21. Richards eventually admitted to taking Xanax, Ambien, Adderall, Norco, doxepin, and testosterone, but he stated that he had prescriptions for the drugs. He was not tested for Ambien. MHP refrained from testing for Ambien because he had already admitted to taking it the night before he went to the range. The record reflects that Richards did in fact have prescriptions for the cornucopia of medications.

¶22. After receiving the test results, MHP charged Richards under a Group Three offense and issued him a statement of charges. Group Three offenses include reporting to work under the influence of drugs or alcohol, using drugs or alcohol at work, and other substance-related prohibitions. Specifically, Group Three, clause c prohibits: "[r]eporting to work under the influence of, or when ability is impaired by, alcohol or the unlawful use of controlled sustances[.]" Based on the structuring of MHP's general order policy manual, the offense is governed and controlled by its over-arching order 5.52.05(a), which specifically prohibits "[r]eporting for work under the influence of, or when one's ability is impaired by, the use of alcohol, and/or a controlled substance" in general.

¶23. Richards was given the opportunity to review this statement of charges and was at all times subject to MHP's orders and policies. Following his review of the statement, Richards

7

signed a waiver form and voluntarily forfeited a hearing before the Performance Review Board. The waiver confirmed that Richards received his notice, "voluntarily waiv[ed] the benefit of a hearing," and willingly "accept[ed] any penalty assessed by the Director, MHSP." Following his waiver, MHP terminated Richards' employment.

¶24.    Despite the fact that he admitted to attending his training with the drugs in his system and voluntarily waived a hearing, Richards appealed his termination to the EAB.  The crux of his argument focused on his contention that MHP wrongfully terminated his employment for reporting to work under the "unlawful" use of controlled substances.  His defense was that it was impossible for him to "unlawfully" use the substances because he had valid prescriptions for the drugs present in his system on the day of his training.[2]

¶25.    At his hearing, Richards' peers and superiors testified about the drugs in Richards' system and his substantially impaired condition at the firing range.  Director Sam Howell of the Mississippi Forensics Laboratory testified on behalf of MHP that the combination and number of drugs in Richards' system could cause significant impairment and "create an imminent danger to himself and others," especially on a firing range.  He also testified that based on the record that tracked Richards' prescriptions, Richards was taking the maximum dosage for his prescriptions.   Agent Tammy Reynolds, a psychiatric mental-health nurse

---

[2] Richards was later indicted for prescription fraud related to his dual prescriptions for Ambien.  *See* Miss. Code Ann. § 41-29-144 (Rev. 2012).  The indictment occurred after his termination and alleged that he was illegally receiving and using the drug Ambien because he had two separate prescriptions of the drug from two different providers and pharmacies. Charges were subsequently dismissed via nolle prosequi.

practitioner for the Mississippi Bureau of Narcotics, also testified that in her medical opinion and based on the combination and number of drugs present in Richards' system, she was surprised that Richards was even alive.

¶26. Richards denied being impaired at the firing range and relied heavily on the fact that he qualified for weapons' usage during training to bolster his position. But when the hearing officer asked whether he read any of his medication's warning labels regarding impairment, Richards admitted that he did not read such literature. He also claimed that he would refrain from driving after taking medication because he knew he would have "felt as though [he was] impaired or intoxicated[.]"

¶27. Despite the wealth of evidence and Richards' admission to using drugs while on duty, the hearing officer of the EAB scrutinized the phrase "unlawful use." The hearing officer found that MHP failed to show Richards reported to work under the influence of unlawful drugs because he had prescriptions for the variety of drugs in his system. To his point that MHP failed to show Richards reported to work impaired in general, the officer squarely relied on Richards' word and his weapons qualifications, for which he received additional assistance that his peers did not require. The hearing officer further stated that "[t]hose serving in a law enforcement capacity are people too" and focused on the point that Richards was on medication due to a car wreck. The officer ultimately held that the basis for Richards' termination was "untrue" and reinstated his employment with back-pay and other benefits. MHP appealed to the full EAB, which came to a similar conclusion and upheld the

hearing officer's decision.

¶28. MHP appealed to the Hinds County Circuit Court. The circuit court found that MHP "presented evidence of impairment, medical testimony on the dangers of the combination of drugs found in Richards' system, and multiple prescriptions of drugs from different providers." On the other hand, "Richards' prescriptions and passing firearm score [were] not substantial evidence." The court ultimately found that the hearing officer acted arbitrarily and capriciously by ignoring the large volume of evidence of Richards' impairment. As a result, the court reversed the decision of the EAB and reinstated Richards' termination.

¶29. Aggrieved, Richards appeals his termination. He maintains his central argument that MHP could not have validly terminated him since he had prescriptions for the drugs in his system.

**STANDARD OF REVIEW**

¶30. "The scope of judicial review of the findings and actions of an administrative agency is well-settled." *Ray v. Miss. Dep't of Pub. Safety (Ray II)*, 172 So. 3d 182, 187 (¶15) (Miss. 2015). We will affirm an agency's decision if it was "(1) supported by substantial evidence; (2) not arbitrary or capricious; (3) within the scope or power of the agency; and (4) not a violation of the aggrieved party's constitutional or statutory rights." *Miss. Dep't of Wildlife, Fisheries & Parks v. Bradshaw*, 196 So. 3d 1075, 1082 (¶19) (Miss. Ct. App. 2016). "Substantial evidence exists so long as there is evidence that a reasonable mind might accept as sufficient to support a conclusion." *Ray II*, 172 So. 3d at 187 (¶16).

10

¶31.    Because this standard of review is "very limited," neither we nor any inferior tribunal are "authorized to substitute [our] judgment for that of the agency where there is substantial (that is, more than a scintilla of) evidence to support the finding." *Id*. at (¶¶16-17). Consequently, "there is a rebuttable presumption in favor of the agency decision and the burden of proof is on the party challenging [the] decision." *Id*. at (¶16).  An inferior tribunal that "reweigh[s] the evidence" and fails to "give sufficient deference" to the agency's findings" erroneously disregards the standard of review. *Id*. at (¶14).

### I.    Richards' termination was supported by substantial and credible evidence.

¶32.    On appeal, Richards argues that the circuit court erred in reversing the EAB's decision and reinstating his termination.  Part of his argument hinges on the claim that MHP lacked the substantial and credible evidence necessary to prove that he "unlawfully" used controlled substances. As set out above, Richards' defense rests on the fact that he had prescriptions for the massive array of drugs found in his system on training day.

¶33.    When determining whether an agency relied on substantial evidence, we have routinely held that "[s]ubstantial evidence exists so long as there is evidence that a reasonable mind might accept as sufficient to support a conclusion." *Id*.  "'Substantial evidence' may be less than a preponderance, but must be more than a scintilla, and must be such that would make any conclusion based on that evidence a reasonable one." *Miss*. *Dep't of Transp. v. Rutland*, 965 So. 2d 696, 703 (¶12) (Miss. Ct. App. 2007) (internal quotation marks omitted).

¶34.    Not long ago, a complex issue of whether substantial evidence supported an agency's

11

termination filtered through our appellate courts in *Ray v. Mississippi Department of Public Safety*, 172 So. 3d 199 (Miss. Ct. App. 2014) (*Ray I*), and *Ray v. Mississippi Department of Public Safety*, 172 So. 3d 182 (Miss. 2015) (*Ray II*).

¶35. In *Ray I*, the MHP charged a highway patrolman with issuing illegal tickets to drivers. *Id*. at 201 (¶3). His statement of charges concerned just four named motorists. *Id*. But MHP's Performance Review Board additionally relied on the officer's written admission to an investigator that he had written 20 to 25 invalid tickets to "increase [his] ticket activity." *Id*. at 203 (¶13). Following a hearing, the officer's employment was terminated. *Id*. at 200 (¶1). Each board and the circuit court he appealed to considered the 20 to 25 other tickets and upheld his termination. *Id*. at 204 (¶17-18).

¶36. The officer appealed, arguing the agency's findings should be narrowly limited to only the four motorists specified in his charges. *Id*. In his view, the agency never proved that the four motorists were among the 20 to 25 tickets he admitted to illegally issuing. *Id*. at 206 (¶24). As a result, he insisted the agency lacked the substantial evidence necessary to terminate him on the basis of his charge he was issued. *Id*.

¶37. The Court of Appeals focused squarely on the tickets issued to the four motorists specified in the officer's statement of charges. *Id*. at 208 (¶35). After scouring the record, we found the officer's arguments persuasive. *Id*. We reasoned that although he did admit to issuing illegal tickets to about 20 to 25 motorists in general, he did not admit to writing illegal tickets for any of the four named drivers. *Id*. We also found the record did not

12

support a finding that the officer "wrote and voided" tickets for the four named drivers because they either stated they never physically received illegal tickets or admitted they may have actually committed the offense. *Id*. at 207 (¶¶27-31).

¶38. After looking to the technical language of the officer's charges, this Court ultimately concluded there was no concrete proof the officer targeted the four motorists. *Id*. at 208 (¶34). Consequently, we found the MHP lacked substantial evidence to support his termination. *Id*. at (¶32). We reversed the circuit court's decision and ordered reinstatement along with "full back pay and benefits." *Id*. at 208-09 (¶¶35-36).

¶39. Our Supreme Court granted certiorari and reversed. *Ray II*, 172 So. 3d at 191 (¶35). The Supreme Court rejected a narrow reading of the charges, instead considering the over-arching purpose of the charges to conclude there was substantial evidence to support the officer's termination. *Id*. at 191 (¶33).

¶40. To come to this conclusion, the Supreme Court looked to the final disciplinary notice where the officer was charged for four counts of "Group Three Offenses," including "falsification of records." *Id*. at 184 (¶3). The Court ruled that the 20 to 25 tickets were clearly relevant to the "allegations contained in the final disciplinary notice" because the other tickets were undoubtedly falsified records. *Id*. at 190 (¶29).

¶41. After settling that issue, the Supreme Court relied on the "very limited" standard of review and focused on the ample amount of evidence which supported the officer's termination. *Id*. at 187-88 (¶¶17-20). Specifically, the Court emphasized that the officer

admitted to falsifying records by writing illegal tickets. *Id*. at 188 (¶20). The Court also considered "statements from [the] four different motorists which showed that the officer had written tickets in addition to the ones he had given them." *Id*. at 187 (¶17). Finally, the Court highlighted an investigator's testimony that there were an "exceptional number of voided tickets on [the officer's] control sheets" written by him to "pad his weekly reports." *Id*. at 188 (¶18). As a result, the Court found that there was in fact substantial, credible evidence to support the officer's termination. *Id*. at (¶21).

¶42. Overall, the Supreme Court found our analysis in *Ray I* focused excessively on a narrow, technical reading of the officer's charges and not on his uncontested admissions in addition to the other substantial evidence. *Id*. at 187-88, 191 (¶¶17-20, 33).

¶43. In accord with *Ray II*, we look to the "very limited" standard of review and also to the scope of Richards' charges. The Mississippi Department of Safety has established its rules within a General Order Manual. Its policy is that DPS employees must "conduct themselves in accordance with high personal standards, comply with the laws of this state, comply with prescribed departmental rules and regulations, and perform their assigned duties and responsibilities effectively and satisfactorily." According to the manual, "Group Three offenses are the most serious." Richards was charged with an offense within that very group. Prohibited behavior includes taking personal leave time "in excess of three consecutive working days" without permission, using controlled substances off-duty in a manner that is "contrary to the employee's oath of office," possessing or using alcohol while at work, or

reporting to work under the influence of alcohol. Prohibited behavior under this category also includes "[r]eporting to work under the influence of, or when ability is impaired by, alcohol or the unlawful use of controlled substances."

¶44. Group Three offenses are punishable by a range of sanctions, including suspension without pay, "demotion, or dismissal." The offenses are also supplemented by more generalized orders cited within MHP's policy manual, which prohibit "[t]he unlawful manufacture, distribution, dispensing, possession or use of a controlled substance while on the job or on the agency's premises," and "[r]eporting for work under the influence of, or when one's ability is impaired by, the use of alcohol and/or a controlled substance" in general.

¶45. Richards was charged under Group Three, section c for "reporting to work under the influence of, or when ability is impaired by, alcohol or the unlawful use of controlled substances." When looking to the language of Group Three, section c in relation to other general orders, its purpose is not just to prohibit troopers from reporting to work under the influence of unlawfully used controlled substances, but to prohibit the troopers from *ever* reporting to work under the influence of controlled substances. As set out below, Richards violated the provision above and disobeyed the general orders which governed his employment. He then signed a waiver rejecting a hearing on this charge because there were no facts in dispute.

¶46. Specifically, the trooper admitted that he consumed a variety of different prescription

15

drugs on the morning of his training—including amphetamines, painkillers, and other behavior-altering drugs—plus, Ambien. He then tested positive for these same drugs. Eyewitness testimony supports the fact that the plethora of these same drugs found in Richards' urine had a debilitating effect on him because several of his fellow officers and superiors commented on his highly questionable behavior at the firing range. And given Richards' tremendously altered state, his fellow troopers would have been compelled to place him under arrest the moment he attempted to leave the shooting range by car, pursuant to the general policy to "comply with the laws of this state" and "comply with prescribed rules and regulations."

¶47. After these events developed, Richards was presented a statement of charges notifying him of his wrongdoing. Aware of his behavior at the range and extensive drug-use, he voluntarily waived his right to a hearing before the PRB and "accept[ed] any penalty assessed by the Director, MHSP." Like the officer in *Ray II*, this constitutes a sufficient basis to find that substantial evidence exists to support Richards' termination. *See Wilburn v. Highway Safety Patrol*, 795 So. 2d 575, 578 (¶11) (Miss. Ct. App. 2001) (determining that substantial evidence existed to support the agency's termination where the patrolman admitted to misconduct).

¶48. Furthermore, the nurse practitioner testified at his hearing that she was surprised that Richards was even still alive after seeing the number and combination of drugs present in his urine sample. She further testified that, regardless of the fact that Richards had prescriptions

16

for the drugs present in his body, "the effect of being under the influence of a combination of such drugs would likely result in significant impairment." Director Howell corroborated her statements by testifying that the combination of drugs in Richards' system could cause impairment and "create an immediate danger to himself and others," especially at a firing range.

¶49. In light of the overwhelming evidence above, we find that substantial and credible evidence existed to support Richards' termination. As in *Ray II*, admitted to taking multiple drugs prior to going to work and in turn violated a Group Three violation by reporting to work under the influence of those drugs. To affirm, there need only exist evidence "that a reasonable mind might accept as sufficient to support a conclusion." *Bradshaw*, 196 So. 3d at 1082 (¶18). Based on the foregoing evidence, we find that a "reasonable mind" would determine that Richards was impaired by his use of controlled substances at the time of his training. *Id*.

¶50. As forbidden by the "very limited" standard of review, the EAB substituted its judgment for that of the agency. This it cannot do, for the EAB must affirm the agency's decision if substantial evidence exists to support that decision. *Ray II*, 172 So. 3d at 187 (¶¶15, 17). In addition, Richards failed to carry his burden to prove that the agency decision was presumptively incorrect. *Id*. at 187 (¶16) ("[T]here is a rebuttable presumption in favor of the agency decision and the burden of proof is on the party challenging the decision."). In fact, by his own admissions, Richards confirmed that substantial evidence existed to

17

support his termination. We therefore find that such evidence exists to support the agency's decision and uphold Richards' termination.

¶51. Furthermore, because Richards' termination was supported by substantial and credible evidence, we accordingly find that his termination was neither arbitrary nor capricious. "If an agency's decision is supported by substantial evidence, then it is not arbitrary or capricious." *Miss. Transp. Comm'n v. Anson*, 879 So. 2d 958, 964 (¶17) (Miss. 2004). As set out above, there was substantial evidence to support Richards' termination. Accordingly, his termination was not arbitrary or capricious.

¶52. Furthermore, Richards does not contest that his termination was within the scope or power of MHP.

¶53. The separate opinion insists we applied the standard of review incorrectly. Specifically, it argues our role is to determine whether the EAB, not the employing agency, relied on substantial evidence to support its findings. For the sake of addressing the separate opinion's concerns, we clarify that in finding substantial evidence exists to support Richards' termination, we also find the EAB's decision was *not* supported by substantial evidence. We reiterate that the EAB essentially reached its conclusion by relying on Richards' word and the fact that he qualified for weapons *with the help of a fellow officer*. The EAB ignored the fact that Richards admitted to taking multiple prescription drugs and stated at his hearing that he would not have driven a car after ingesting such drugs for fear of being impaired. It disregarded evidence of Agent Reynolds, a twenty-year narcotics agent and registered nurse,

18

who testified without contradiction that the combination of the substances was near-lethal. The EAB was unphased by the fact that *several* of Richards' peers noticed his condition and were concerned that he was on the range with weapons. The EAB was further unmoved by Richard's termination letter, which painted a picture of his very abnormal behavior at the firing range. Rather, the EAB relied on Richards' denial, a weapons course he passed with the help of another, and the fact that he, as a law-enforcement officer, is a "[person] too." But in light of all the other evidence against the trooper, and the dangerous consequences at stake should he be reinstated, this Court cannot find that that evidence counts as "substantial."

¶54.    The separate opinion also points to several facts in the record that explain away Richards' odd behavior and tips the scale in the trooper's favor. For example, Sam Howell testified that "[Richard's] urinalysis only established that the substances were 'in his system,' and did not show 'whether [he] was under the influence or impaired at the time.'" Yet in this case, the trooper's impairment was described, in detail, by several of his peers who witnessed his behavior. The separate opinion also points out one of the officer's concession that "Richards could have experienced an equipment malfunction on the range." Yet the captain also inferred this was unlikely, for if Richards' weapon was actually malfunctioning, the officers would have swiftly replaced it because the gun could be used in the line of duty.

¶55.    The separate opinion further states that one of the officers who testified was "not close enough to Richards to determine the cause of the problems Richards was experiencing on the

19

range." Yet that same officer testified that he was "behind the bleachers directly behind [Richards]." The separate opinion mentions that it was not unusual for Richards to sweat because it was eighty degrees outside that day, but Richards did not introduce any documents to prove this. And it certainly does not explain why several officers saw him sweating "profusely" when "no one else was."

¶56. As the separate opinion points out, it is true that under the limited standard of review, "[w]e have no authority to reweigh the evidence or make our own credibility determinations." But the standard does not strip this Court of the duty to review the lower tribunal's evidence and determine whether it was substantial enough to completely reverse the decision of an agency that has much more closely observed the behavior of the person it terminated. Substantial evidence is "such relevant evidence as reasonable minds might accept as adequate to support a conclusion." We find that the EAB's conclusions are not reasonable. This is not an "argument," but rather the role of this Court.

¶57. Therefore, the termination is affirmed.

## II. Richards received due process.

¶58. We now turn to whether the use of the phrase "unlawful use" in Richards' statement of charges deprived him of adequate notice and infringed on his right to due process.

¶59. In order to satisfy due process in agency proceedings, "agency actions must provide minimum procedural due process, which requires (1) notice and (2) an opportunity to be heard." *Ray II*, 172 So. 3d at 190 (¶31). "Any technical error in this case [is] harmless" if

Richards "had clear notice of the conduct and the nature of the charges for which he was subject to discipline." *Bradshaw*, 196 So. 3d at 1084 (¶24).

¶60.    Our courts are not strangers to addressing whether the technical language of a notice undercut an agency's decision.  In *Bradshaw*, a conservation officer who worked for the Department of Wildlife, Fisheries, and Parks (MDWFP) was terminated from his position after he sent several sexually explicit text messages to a woman. *Id*. at 1077 (¶1).  The woman filed a complaint with the agency and subsequently "filed an affidavit charging [the officer] with telephone harassment, a misdemeanor." *Id*. at 1079 (¶5).  Accordingly, the agency charged him under a

> Group Three Number 13 offense of, "an act or acts of conduct, *including, but not limited to, the arrest or conviction for a felony or misdemeanor*, occurring on or off the job which are plainly related to job performance and are of such a nature that to continue the employee in the assigned position could constitute negligence in regard to the agency's duties to the public or to other State employees."

*Id*. at (¶6) (emphasis added).

¶61.    Following a hearing, MDWFP terminated the officer's employment. *Id*. at 1080 (¶10). However, the agency terminated him under a *Number 14* offense, rather than the Number 13 offense it originally charged him under.  *Id*.  Specifically, MDWFP held that

> Bradshaw's actions constituted a Group Three Number 14 offense of, "an act or acts of conduct occurring on or off the job which are plainly related to job performance and are of such a nature that to continue Bradshaw in his assigned position could constitute negligence in regard to the agency's duties to the public or other State employees."

*Id*.

21

¶62. The terminated officer argued that he did not receive proper notice because the offense for which he was charged was different from the offense for which he was ultimately terminated. *Id*. at (¶13). But we rejected this argument, noting that the language of each offense was essentially "identical" with the exception of the added phrase: "*including, but not limited to, the arrest or conviction for a felony or misdemeanor*." *Id*. at 1080-81 (¶13) (emphasis added). The Court further pointed out that the two offenses were each Group Three offenses "of the most serious nature," and that both encompassed "[an] act or acts of conduct occurring on or off the job which [were] plainly related to job performance . . . ." *Id*. at 1084 (¶23). Finally, we noted that "the plain language of the two definitions encompasse[d] the same conduct," and, likewise, "the two offenses [were] functionally equivalent and [were] only worded slightly differently." *Id*.

¶63. Accordingly, we find that the EAB erred in concluding there was a substantive difference between "reporting to work under the influence of controlled substances" and "reporting to work under the influence of *unlawful* controlled substances." Per *Bradshaw*, we find that the offense for which Richards was charged "encompasses the same conduct" and is "functionally equivalent" to the remainder of the prohibition in clause 4. *Id*. Each offense sanctions him for "reporting to work under the influence of, or when [his] abilities are impaired by" a substance, which is the underlying aim of his charges.

¶64. Based on the "functionally equivalent" nature of each offense and the termination letter's generalized emphasis on the his use of controlled substances, we conclude that

22

Richards was sufficiently notified of the charges against him, was fully aware of his charges, and was not blindsided by his termination. *Id.* The fact that he waived his hearing at the agency level *after* reviewing the charges and agreed to subject himself to whatever punishment the agency chose further supports this point.[3] MHP fulfilled its obligation to provide Richards with satisfactory due process by adequately notifying him as to why he was being terminated and offering him a hearing. Richards rejected an opportunity to be heard at the agency level. Based on the foregoing, we find that Richards was adequately provided the minimum due process necessary to uphold his termination.

¶65. In its order reversing Richards' termination, the EAB focused on the need for compassion. It did not conclude that Richards had been deprived of due process or was factually innocent of the charges. It did not insist that Richards' fellow officers were unjustified to report him for his complete impairment at the firing range. Yet the EAB's desire to simply give Richards another chance because "law enforcement officers are people, too" is not a legal standard. The heavy amount of drugs in Richards' system directly impacted his ability to properly function as an officer who was sworn to protect the citizens of Mississippi by keeping the highways safe and upholding the sacrosanct duty to preserve human life. The people of Mississippi must be assured that those entrusted to keep them safe

---

[3] Additionally, the fact that Richards worried that his "career was over" *before* taking the drug test and even prior to being charged with misconduct further leads us to believe that he was aware of his precise wrongdoing the minute MHP handed him his statement of charges. The fact that he initially avoided being completely truthful with his superiors about all of the medications he took the morning of the training further supports this conclusion.

23

are able to do so.

¶66. For the reasons set out above, Richards' due process rights were not violated.

## CONCLUSION

¶67. We find that substantial evidence exists to support MHP's termination of Richards. We further find that Richards' due-process rights were not violated.

¶68. For the reasons above, the judgment of the circuit court is affirmed, and the termination of Richards is upheld.

¶69. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS AND McDONALD, JJ., CONCUR. WILSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY LAWRENCE, J.**

**J. WILSON, P.J., DISSENTING:**

¶70. The Department of Public Safety (DPS) fired Highway Patrol Sergeant James Richards for reporting to work on November 1, 2016,[4] while he was allegedly "under the influence of, or when [his] ability [was] impaired by, . . . the unlawful use of controlled substances." Richards exercised his right to appeal his dismissal to the Employee Appeals Board (EAB). Following a de novo hearing, the EAB found that on November 1, 2016, Richards was not impaired or under the influence of controlled substances in general and, more specifically, was not under the influence of any controlled substance that he had used

---

[4] The narrative statement of charges that DPS provided to Richards identified the date as October 31, 2016, but it appears that the true date at issue is November 1, 2016.

unlawfully. The narrow issues that this Court must address are whether the record contains substantial evidence to support the EAB's findings and whether the EAB's decision is arbitrary or capricious.[5] Because the EAB's decision is supported by substantial evidence and is not arbitrary or capricious, it must be affirmed.

¶71. The majority opinion reaches the opposite result only by reviewing the wrong decision and applying the wrong standard of review. Specifically, the majority asks whether there is substantial evidence to support *DPS's original decision to terminate Richards*—not the EAB's subsequent decision reinstating him. Indeed, the EAB's decision is essentially irrelevant to the majority's analysis. Because the majority's analysis is contrary to established law and misstates the subject and standard of review, I respectfully dissent.

    **I.    The EAB hears the case de novo, and this Court must search the record for substantial evidence to support *the EAB's decision*.**

¶72. The members of the EAB are appointed by the State Personnel Board to hold hearings, take evidence, and decide appeals by "state service" employees from adverse employment actions. Miss. Code Ann. § 25-9-129 (Rev. 2018). Any state service employee has the right to appeal an adverse employment action to the EAB. Miss. Code Ann. § 25-9-131(1) (Rev. 2018). An employee who appeals his dismissal to the EAB bears the burden of proof that the stated reasons for his dismissal are not true,[6] but the EAB hears the case "de novo."

---

[5] *See, e.g.*, *Gill v. Miss. Dep't of Wildlife Conservation*, 574 So. 2d 586, 595 (Miss. 1990); *Miss. Dep't of Corr. v. Pennington*, 59 So. 3d 636, 639 (¶¶13-14) (Miss. Ct. App. 2011); *Miss. Dep't of Corr. v. Smith*, 883 So. 2d 124, 129 (¶15) (Miss. Ct. App. 2004).

[6] Miss. Code Ann. § 25-9-127(1) (Rev. 2018); *Pennington*, 59 So. 3d at 639 (¶11).

25

Miss. Code Ann. § 25-9-131(1); *Hemba v. Miss. Dep't of Corr.*, 848 So. 2d 909, 915 (¶20) (Miss. Ct. App. 2003), *overruled on other grounds by Bynum v. Miss. Dep't of Educ.*, 906 So. 2d 81, 104 (¶¶79-80) (Miss. Ct. App. 2004). "[T]he EAB 'is the trier of fact as well as the judge of the witnesses' credibility.'" *Ray v. Miss. Dep't of Pub. Safety*, 172 So. 3d 182, 188 (¶20) (Miss. 2015) (quoting *Bynum*, 906 So. 2d at 90 (¶14)); *accord Hemba*, 848 So. 2d at 915 (¶20). In contrast, a reviewing "court has no right to re-evaluate the credibility of the testimony" before the EAB. *Hemba*, 848 So. 2d at 915 (¶20).[7]

¶73.    When, as in this case, a state agency seeks judicial review of an EAB decision, the "appeal involves a review of the actions of two state agencies." *Smith*, 883 So. 2d at 127 (¶10). The first agency action was DPS's decision to terminate Richards. The second agency action was the EAB's decision to reverse DPS and reinstate Richards. *See id.* In this scenario, a reviewing court must "*search [the record] for substantial evidence to support what the [EAB] did*, as opposed to substantial evidence to support the employing agency's original [termination] decision." *Id.* at 129 (¶15) (emphasis added). This "distinction is significant since 'substantial evidence' is not an especially large quantum. It may be less than a preponderance but it has to be more than a 'scintilla,' . . . which means a mere trace

---

[7] *See also Miss. Dep't of Transp. v. Rutland*, 965 So. 2d 696, 702 (¶9) (Miss. Ct. App. 2007) (stating that in reviewing the decision of the EAB "we are bound to follow the same standard of review as the [circuit] court"); *Miss. Dep't of Corr. v. Smith*, 883 So. 2d 124, 127 (¶10) (Miss. Ct. App. 2004) (explaining that the decision of the circuit court "is largely irrelevant for our purposes" because "we now serve as the second level judicial reviewers of the same [EAB] decision that the circuit court reviewed").

or minute amount." *Id.* "Since the amount may be less than a preponderance, there might be substantial evidence to support one fact-finder's view, and the same record may provide substantial evidence to support the opposite view." *Id.* Therefore, we must affirm the EAB's decision if there is "substantial evidence underlying [its] decision to reinstate the employee, *even if there was also substantial evidence to support the earlier termination*" *by the employing agency. Id.* (emphasis added).[8]

¶74.     Unfortunately, the majority opinion reviews the wrong decision and misstates our standard of review. The majority says that we must uphold the termination—and reverse the EAB's decision—because "there was substantial evidence to support [*the*] *termination*." *Ante* at ¶51 (emphasis added); *see also ante* at ¶¶47, 49-50. However, as *Smith* explains, that is *not* the issue for this Court to decide. *Smith*, 883 So. 2d at 129 (¶15). Rather, we ask only whether there is substantial evidence to support *the EAB's decision. Id.*; *accord Bynum*, 906 So. 2d at 90-91 (¶17). As *Smith* further explains, this "distinction is significant" because there may be sufficient evidence to support *both* the agency's original decision to terminate the employee *and* the EAB's subsequent decision to reinstate the employee. *Smith*, 883 So. 2d at 129 (¶15). In that scenario, we must affirm the decision of the EAB—*not the agency*. *Id.*; *Bynum*, 906 So. 2d at 91 (¶17).

¶75.     For the same reason, the majority errs by chastising the EAB for "substitut[ing] its

---

[8] The majority opinion misses this point entirely by equating "substantial evidence . . . to support Richards' termination" with a lack of "substantial evidence" to support the EAB's decision. *Ante* at ¶53.

judgment" and for not applying "the 'very limited' standard of review." *Ante* at ¶50 (quoting

*Ray*, 172 So. 3d at 187 (¶17)). This so fundamentally misstates the law as to turn the case

on its head. The EAB reviews the case "de novo," Miss. Code Ann. § 25-9-131(1), and

"[t]he EAB 'is the trier of fact as well as the judge of the witnesses' credibility.'" *Ray*, 172

So. 3d at 188 (¶20) (quoting *Bynum*, 906 So. 2d at 90 (¶14)). The EAB is not bound by a

"very limited" standard of review. Rather, *reviewing courts*—this Court included—must

apply a very limited standard of review to the *EAB's findings and decision*. *Ray*, 172 So. 3d

at 186-87 (¶17); *Bynum*, 906 So. 2d at 91 (¶17); *see also Gill v. Miss. Dep't of Wildlife*

*Conservation*, 574 So. 2d 586, 595 (Miss. 1990) (affirming the decision of the EAB

reinstating an employee because *the EAB's findings* were supported by "substantial evidence"

and *the EAB's decision* was not "arbitrary or capricious").

¶76.    This Court's decision in *Bynum* succinctly summarizes these points and shows the

errors in the majority's analysis. In *Bynum*, as in this case, we reviewed an EAB decision

that reversed the employing agency and reinstated the employee. Regarding our subject and

standard of our review, this Court held:

> In appeals from the EAB, our review is complicated by the involvement of two
> administrative agencies, the employing agency and the EAB. Because
> substantial evidence may be less than a preponderance, it is possible for the
> same evidentiary record to provide substantial support for both the decision of
> the EAB and a contrary decision of the employing agency. **Our precedent**
> **establishes that the decision which we are examining for support of**
> **substantial evidence is that of the EAB.** Because it is the decision of the
> EAB that is under appellate review, if that decision is supported by substantial
> evidence, we may not interfere even if, viewed another way, the evidence
> would have provided substantial support for the opposite outcome.

28

*Bynum*, 906 So. 2d at 90-91 (¶17) (emphasis added). These points cannot be made any clearer than that.

¶77. It seems to be a stumbling block for the majority that in appeals from the EAB, the Supreme Court and this Court sometimes refer to judicial review of the "agency decision." *E.g.*, *ante* at ¶¶30-31, 50. **The EAB is an "agency."** As this Court has explained, appeals such as this "involve[] a review of the actions of *two administrative agencies*, the employing agency and the EAB." *Bynum*, 906 So. 2d at 90-91 (¶17) (emphasis added); *accord Smith*, 883 So. 2d at 127 (¶10). We review the "second *agency action*": the EAB's decision to reverse the employing agency and reinstate the employee. *Smith*, 883 So. 2d at 127 (¶10) (emphasis added).

¶78. The majority's misstatement of the subject and standard of our review distorts the whole majority opinion. The majority consistently reweighs the evidence, draws all inferences against the EAB's findings, and describes the testimony and evidence in the light least favorable to the EAB's decision. To take one obvious example, the first sentence of the majority opinion states as fact that Richards "reported to work heavily impaired by a near-lethal combination of multiple controlled substances." *Ante* at ¶1. Of course, that is *the* central factual dispute in the case and the subject of conflicting testimony and evidence before the EAB, and the EAB—"the trier of fact"—found that Richards was *not* impaired. Moreover, the claim that Richards's use of prescription medications was "near-lethal" is not supported by any credible evidence. The only possible support is a nurse's bald assertion that

29

she was "surprised" that Richards was "alive today." The nurse provided no reliable or scientific basis for her surprise, and as discussed below, the actual expert on the subject (Sam Howell) testified that Richard's drug test showed only that substances were present "in his system." The EAB was not required to accept the nurse's unreliable and unsupported assertion. *See, e.g.*, *State ex rel. Allain v. Miss. Pub. Serv. Comm'n*, 435 So. 2d 608, 621-22 (Miss. 1983) (holding that an administrative agency sitting as the trier of fact and "the sole judge of the credibility of the witnesses" is "free to . . . reject" opinion testimony that it finds "conjectural, unrealistic, and unreliable"). Nonetheless, the majority accepts the nurse's surprise as if it were scientific fact. Such a one-sided view of the evidence unfortunately pervades the entire opinion.

¶79. By granting state service employees the right to an appeal and a de novo hearing before the EAB, the Legislature has granted a significant protection to the employee and imposed a check on the authority of state agencies. "Our constitutional duty . . . is to apply the law, and leave matters of public policy to the other branches." *Barbour v. State ex rel. Hood*, 974 So. 2d 232, 244 n.19 (Miss. 2008) (Dickinson, J., concurring). In this context, the law requires us to review and defer to the decision of the EAB, not the employing agency. By doing the opposite, the majority effectively erases the EAB's decision and nullifies the employee's statutory rights.

**II.  The EAB was presented with conflicting evidence regarding the conduct for which Richards was terminated.**

¶80. On October 31 and November 1, 2016, Sergeant Richards attended in-service training

30

at the Law Enforcement Officers' Training Academy in Pearl. On November 1, Richards qualified successfully with four different firearms—two pistols, an AR-15 rifle, and a shotgun—by hitting targets on the firing range.

¶81. However, other officers present on November 1 thought that Richards appeared to be under the influence of some substance, and he was asked to go to the Mississippi Forensics Laboratory for a drug test. Richards consented to the drug test (a urine test) and disclosed that he was taking several prescription medications. Richards tested positive for alprazolam (Xanax), hydrocodone (Norco), oxycodone (Percocet), and amphetamine (Adderall). He also disclosed that had taken Ambien the night before, although he was not tested for it.

¶82. There is no dispute that Richards had prescriptions for Ambien and all of the substances for which he tested positive. The same doctor prescribed Richards both Norco and Percocet for pain related to a hip injury and total hip replacement surgery.[9] In addition, Richards was prescribed Xanax for shaking in his hands, Ambien to help him sleep, and Adderall for attention deficit disorder.

¶83. Sam Howell, the director of the Forensics Laboratory and a forensic toxicologist and forensic chemist, testified that Richards's urinalysis could not show whether Richards was under the influence or impaired at the time, when he last took any of the substances for which he tested positive, or the amount he took. The urinalysis only established that the substances

_____

[9] Richards was severely injured and dislocated his hip in 1994 in an automobile wreck during a high-speed pursuit. He was employed by the Meridian Police Department at the time. The injury eventually required a total hip replacement surgery in 2015.

were "in his system." Howell testified that Richards "probably" took Norco, Percocet, and Adderall within twenty-four hours before the test and Xanax within forty-eight hours before the test. Howell's testimony was consistent with Richards's testimony that he took Percocet and Ambien before he went to bed on October 31 and then took Norco, Adderall, and Xanax in the morning on November 1.[10] Richards testified that he took Percocet and Norco because he was experiencing pain in his hip following training activities on October 31. Richards testified that he took all of the medicines as prescribed, that he was not impaired or under the influence on November 1, and that he was able to drive and shoot safely.

¶84. The evidence is conflicting regarding whether Richards was impaired or under the influence at the firing range on November 1. At the EAB hearing, DPS called two witnesses who had seen Richards and testified regarding his appearance and behavior at the Training Academy on November 1. Major Malachi Sanders believed that Richards was impaired. Sanders testified that Richards's eyes were red, he seemed "disoriented" and "out of it," and "[h]e just wasn't himself."

¶85. Master Sergeant Lonnie Griffin testified that he was "first alerted to [Richards's] condition by one of the [firearms] training officers." According to Griffin, Richards was "having trouble staying focused when he was shooting," "doing a lot of fumbling around,"

---

[10] The majority opinion asserts that Richards "admitted that he consumed a variety of different prescription drugs on the morning of his training—including amphetamines, painkillers, and other behavior-altering drugs—plus Ambien." *Ante* at ¶46. This is incorrect. Richards testified that he took three prescription medications that morning, which included only one painkiller. He did not take Ambien that morning.

and having difficulty reloading his magazine. Griffin stated that a training officer had to coach Richards "constantly" and that Richards fell behind the rest of his group. Griffin stated that Richards was "sweating profusely" seemed to be "moving in slow motion." One of the training officers told Griffin that he did not feel like Richards should be shooting. After lunch, Griffin took Richards to the Forensics Laboratory for a urine test. Griffin testified that on the way to the Crime Lab, Richards was speaking in "a real slow murmur." According to Griffin, Richards was "apologetic" and said that "his career [was] over." On cross-examination, Griffin conceded that Richards could have experienced an equipment malfunction on the range. Griffin was not close enough to Richards to determine the cause of the problems Richards was experiencing on the range.

¶86. DPS also offered several unsworn statements and/or emails from witnesses who had seen Richards on November 1, 2016. Captain Gayle McMullin stated that Richards was "sweating profusely and lethargic" and that she did not think it was safe for him to shoot or drive in his condition. Range Director Philip Hemphill stated that Richards "appeared to be impaired," was "sweating profusely," and was "unsteady"; that "his speech was slowed and slurred a bit"; and that "he appeared to be in another world." Hemphill also stated that Richards wiped his face by lying down on a towel that he had placed on the ground "rather than bending over and picking up the towel." Trooper Lee Houston stated that Richards "seemed very impaired," was sweating profusely, was "very unsteady on his feet," "seemed to be swaying at times," and appeared to be "under the influence [of] something." Trooper

33

Anthony Granderson stated that Richards was sweating profusely and that "his speech was slurred pretty bad." Finally, Lieutenant Charles Coleman stated that on the afternoon of November 1, "Richards seemed to be very incoherent and unresponsive . . . , his speech was slurred, and [his] face [was] flushed red."

¶87. However, Richards testified at his EAB hearing and denied that he was impaired or under the influence on November 1 or at any time while on duty. Richards testified, and there is no dispute, that he finished shooting and achieved a passing score with all four firearms. Richards explained that the instructor had to help him with his AR-15 only because "[t]he bottom of the magazine . . . completely came out" and "[e]verything dumped out of it." Richards stated that the instructor was unable to reassemble the magazine and that he ultimately had to borrow someone else's magazine. Aside from that issue, he had no difficulty using any of the firearms.[11] Richards stated that the weather was sunny, that the temperature was in the 80s, and that it was not unusual for him to sweat when he was outside in warm, sunny weather. Richards testified that his gait is always uneven because of his hip problem and because his right leg is two inches shorter than his left leg. Richards testified

_____

[11] The majority opinion asserts that Richards "qualified . . . *with the help of a fellow officer*." *Ante* at ¶53 (emphasis by the majority). Obviously, the evidence on this point is in conflict. Griffin testified that an instructor coached Richards "constantly . . . through the whole thing." Griffin stated a trooper should not need assistance unless he was given a "defective weapon." Richards testified that he *was* given a defective weapon and that aside from that issue, he had no difficulty on the shooting range. The EAB, as the trier of fact, obviously found Richards's testimony more credible. As with so many other factual disputes, the majority opinion simply reweighs the evidence and makes a contrary finding.

34

that he knew how his different prescription medications affected him, and he was certain that he was not impaired or under the influence on November 1. Richards's testimony at the EAB hearing was consistent with prior recorded and written statements he had given to DPS.

### III. Allegations of prior misconduct by Richards are irrelevant to the issues in this appeal.

¶88.   The majority opinion spends a good deal of time discussing allegations about other incidents between 2010 and 2016 when Richards allegedly was impaired or under the influence. *Ante* at ¶¶3-8. DPS's allegations regarding prior incidents are troubling. For example, Major Sanders claimed that starting in 2010, DPS "received an influx of people calling in complaining on [Richards] about being . . . drunk" or "under the influence of something." Sanders said that among other complaints, he received multiple reports that Richards "was all over the road" while "he was driving his patrol car." Sanders stated that he raised the complaints against Richards "up the chain of command," but his superiors at DPS "would just tell [him] to talk to [Richards] and try to get him help." Sanders testified that Richards always denied that he had a problem, and it appears that DPS never imposed any significant discipline for these prior alleged incidents.

¶89.   If DPS's allegations regarding prior incidents are true, then Richards should have been fired long before the incident at the firing range on November 1, 2016. If the allegations are true, then DPS apparently knew for several years that a trooper was habitually under the influence of alcohol or controlled substances while on duty, and yet DPS continued to allow the trooper to drive, carry a gun, and exercise full law enforcement powers. That would be

seem to be as much an indictment of DPS as of Richards.

¶90. The problem is that DPS's allegations regarding prior incidents were not the basis of Richards's termination, and he received no notice that he would be required to defend against them. These allegations were not mentioned in the statement of charges provided to Richards or in the final agency action terminating his employment. Rather, Richards was terminated solely for allegedly showing up to work on November 1, 2016, under the influence of controlled substances that he had used unlawfully. Therefore, only evidence regarding that allegation was relevant to the EAB's decision and this Court's review of the EAB's decision. *See* 27 Miss. Admin. Code Pt. 110, R. 10.7(19)(D) (2017) ("In the appeal of formal disciplinary action, the [EAB's] presiding hearing officer shall hear or receive evidence on only those reasons and allegations contained in the responding agency's final disciplinary notice to the employee of such action.").[12]

### IV. There is substantial evidence to support the EAB's decision.

¶91. As discussed above, the law is clear that we must affirm the EAB's decision if there is "substantial evidence" to support it. As this Court stated in *Smith*, "'substantial evidence' is not an especially large quantum" and is "less than a preponderance." *Smith*, 883 So. 2d at 129 (¶15). In this case, there is substantial evidence to support the EAB's decision on either of two grounds.

¶92. First, Richards testified that he did not take more than the prescribed dosage of any

---

[12] This rule is now Rule 9.17(D) in Part 120 of Title 27.

his prescription medicines, that it was safe for him to drive and use firearms, and that he was not impaired or under the influence on November 1, 2016, or any other time while on duty. The fact that he successfully qualified with four different firearms tends to corroborate his testimony. Moreover, although several witnesses claimed that Richards appeared to be under the influence of something while he was on the shooting range, none of those witnesses intervened to stop Richards from continuing to discharge his firearms. Rather, as the EAB noted in its decision, they allowed Richards to continue shooting two pistols, an AR-15 rifle, and a shotgun for an extended period of time until he had successfully qualified with all four weapons. To be sure, DPS also presented testimony and other evidence that Richards appeared to be impaired. However, as stated above, "[t]he EAB 'is the trier of fact as well as the judge of the witnesses' credibility.'" *Ray*, 172 So. 3d at 188 (¶20) (quoting *Bynum*, 906 So. 2d at 90 (¶14)). In that role, "the EAB is empowered to accept the testimony of one witness over another." *Miss. Forestry Comm'n v. Oglesby*, 105 So. 3d 375, 383 (¶23) (Miss. Ct. App. 2012). We have no authority to reweigh the evidence or make our own credibility determinations. *Hemba*, 848 So. 2d at 915 (¶20). Applying our limited standard of review, we are bound to affirm the EAB's finding that Richards was not under the influence and the EAB's decision reinstating Richards.

¶93.    Second, the EAB also reinstated Richards on the narrower ground that DPS's specific stated reason for terminating him was not true. In the statement of charges provided to Richards, DPS alleged that Richards violated DPS General Order 9.03.04(B)(3)(c) and

37

committed a "Group III Offense" by "[r]eporting to work under the influence of, or when [his] ability [was] impaired by, . . . the *unlawful* use of controlled substances." (Emphasis added). Richards's termination notice relied on the same allegation.

¶94. The EAB found that DPS's allegation was not true, and there is substantial evidence to support the EAB's finding. It is undisputed that Richards had prescriptions for every substance for which he tested positive. DPS argues that Richards unlawfully obtained and used *one* of his medications (Ambien) because he obtained prescriptions for it from two providers without disclosing to either provider that he had another prescription. *See* Miss. Code Ann. § 41-29-144(1) (Rev. 2018) ("It is unlawful for any person knowingly or intentionally to acquire or obtain possession or attempt to acquire or obtain possession of a controlled substance or a legend drug by larceny, embezzlement, misrepresentation, fraud, forgery, deception or subterfuge."). However, Richards testified that he took Ambien, as one would expect, to help him go to sleep on October 31. There is no credible evidence that he was still impaired by or under the influence of Ambien when he attended in-service training the following day. Accordingly, there is substantial evidence to support the EAB's findings and decision on this narrower ground as well.

¶95. The majority makes a different argument than DPS. Although DPS fired Richards for reporting to work under the influence of substances he had used unlawfully, the majority argues that it *does not matter* whether Richards's use of his prescription medications was lawful or unlawful. In support of this argument, the majority cites a different General Order

38

(5.52) that at the time of Richards's termination provided, "Reporting for work under the influence of, or when one's ability is impaired by, the use of alcohol and/or a controlled substance is prohibited."[13] DPS did not cite this provision in the narrative statement of charges or notice of termination provided to Richards. Rather, DPS offered an incomplete copy of General Order 5.52 at the hearing before the EAB. The majority argues that we may uphold Richards's termination based on this uncharged provision because it is "functionally equivalent" to the provision Richards was actually charged with violating. *Ante* at ¶¶62-64 (quoting *Miss. Dep't of Wildlife, Fisheries & Parks v. Bradshaw*, 196 So. 3d 1075, 1084 (¶23) (Miss. Ct. App. 2016)).

¶96.   There are two problems with the majority's argument. The first is that the EAB found that Richards was not impaired by or under the influence of *any* controlled substances, whether used lawfully or unlawfully. As discussed above, that finding is supported by substantial evidence and therefore must be affirmed—which necessarily defeats the majority's argument that Richards violated General Order 5.52.

¶97.   The second problem with the majority's argument is that the language of General Order 5.52 is *not* "functionally equivalent" to the Group Three Offense that DPS charged Richards with violating. In *Bradshaw*, we held that two Group Three Offenses were "functionally equivalent" because their language was nearly identical and literally prohibited the "same conduct." *Bradshaw*, 196 So. 3d at 1084 (¶23). For that reason, we held that

---

[13] DPS does not make this argument or cite General Order 5.52.

"[a]ny technical error" in terminating the employee for one offense after charging him with the other "was harmless." *Id.* at (¶24). Here, in contrast, the majority upholds Richards's termination based on an uncharged provision that is *substantively broader* than the offense that was the basis for his termination. The uncharged provision applies not only to the unlawful use of controlled substances but also to the lawful use of prescription medications.[14] Pursuant to its own rules, the EAB properly refused to allow DPS to change the basis for Richards's termination after the fact. *See* 27 Miss. Admin. Code Pt. 110, R. 10.7(19)(D) (2017).

¶98.    The majority also argues that we should uphold Richards's termination simply because he waived his right to a pre-termination hearing before the DPS Performance Review Board. *Ante* at ¶¶45, 47.[15] The majority even asserts that Richards's waiver was an admission that "there were no facts in dispute." The record shows otherwise. Critically, the majority fails to acknowledge that the waiver, drafted by DPS, expressly stated, "I understand that I am not waiving any of my appeal rights, but only waiving a hearing before the Performance Review Board." Thus, the waiver made clear that Richards's right to appeal was preserved—and that he was not waiving anything other than an informal, intra-agency pre-termination hearing. This is no different than a defendant who pleads "no contest" to charges in municipal or

---

[14] Indeed, the fact that the majority must resort to the uncharged provision is a clear giveaway that the two provisions are not "functionally equivalent." If they actually were "functionally equivalent," the majority would not need to rely on the un-charged provision.

[15] DPS does not make this argument.

justice court and then appeals to county or circuit court for a "trial de novo." No one would argue that the no-contest plea was an admission of guilt for purposes of a trial de novo. Nor did Richards admit that "there were no facts in dispute" for purposes of his de novo hearing before the EAB.

¶99. In summary, there is substantial evidence to support the EAB's findings that Richards was not impaired or under the influence of any controlled substance when he reported to work on November 1, 2016, and, more specifically, that he was not under the influence of any controlled substance he had used unlawfully. Therefore, for two different reasons, there is substantial evidence to support the EAB's finding that the reason for Richards's termination was not true. Accordingly, the EAB's decision is supported by substantial evidence, is not arbitrary and capricious,[16] and must be affirmed.

## CONCLUSION

¶100. The adage that hard cases or bad facts make bad law is tired and probably overused, but it seems to fit here.[17] A few points bear special emphasis about those bad facts and the narrow issue that is actually before this Court in this appeal.

¶101. First, DPS presented the EAB with allegations that for several years Richards had

---

[16] "If [the EAB's] decision is supported by substantial evidence, then it is not arbitrary or capricious." *Miss. Transp. Comm'n v. Anson*, 879 So. 2d 958, 964 (¶17) (Miss. 2004).

[17] Of course, it is our "duty . . . to take care, for the general good of the community, that hard cases do not make bad law." *Cathey v. Dow Chem. Co. Med. Care Program*, 907 F.2d 554, 555 (5th Cir. 1990) (quoting *United States v. Clark*, 96 U.S. 37, 49 (Harlan, J., dissenting) (1877)). For "it is truer still that bad law makes hard cases." *Flores v. Demskie*, 11 F. Supp. 2d 299, 301 (S.D.N.Y. 1998), *rev'd*, 215 F.3d 293 (2d Cir. 2000).

41

exercised law enforcement powers and driven his patrol car while under the influence of alcohol or some controlled substance. At this point, those are just allegations because they have never been the subject of properly noticed charges or a hearing. More important, those allegations are irrelevant to this case because they were not the basis of Richards's termination. If those allegations are true, then it would appear that DPS endangered the public by failing to discipline Richards for serious misconduct. That is troubling in the extreme, but it is not an issue for the EAB or this Court in this case.

¶102. Second, the primary factual dispute in this case is whether Richards was impaired or under the influence of *any* controlled substance—used either lawfully or unlawfully—on November 1, 2016. There is conflicting evidence regarding that narrow factual issue. Richards testified that he was not impaired or under the influence, and his testimony is corroborated by his accurate firing of four different firearms at the time he was allegedly impaired. As the EAB noted, the fact that no one at the firing range intervened to stop Richards from shooting also tends to corroborate his testimony. To be sure, DPS presented testimony and several unsworn statements that Richards appeared to be impaired. But "[t]he EAB 'is the trier of fact as well as the judge of the witnesses' credibility,'" *Ray*, 172 So. 3d at 188 (¶20) (quoting *Bynum*, 906 So. 2d at 90 (¶14)), and "the EAB is empowered to accept the testimony of one witness over another." *Oglesby*, 105 So. 3d at 383 (¶23). This Court has no authority to reweigh the evidence or reevaluate the EAB's credibility determinations. *Hemba*, 848 So. 2d at 915 (¶20). Because there is substantial evidence to support the EAB's

42

finding, it must be affirmed—even though there may also be substantial evidence to support DPS's prior finding to the contrary. *Smith*, 883 So. 2d at 129 (¶15). This remains true even if *we* think that the weight of the evidence favors DPS.[18]

¶103. Third, because there is substantial evidence to support the EAB's finding that Richards was not under the influence of *any* controlled substance, the question whether he could be fired for reporting to work under the influence of a substance that he used lawfully should be a moot point in this appeal. The EAB's finding that Richards was not under the influence of any substance that he used unlawfully is simply an alternative ground on which the EAB's decision may be affirmed. That said, DPS specifically charged Richards with reporting to work under the influence of a substance that he used unlawfully. Therefore, Richards's termination can be upheld only if this specific charge is true. *See* Miss. Code Ann. § 25-9-127(1); 27 Miss. Admin. Code Pt. 110, R. 10.7(19)(D) (2017).[19] There is substantial evidence to support the EAB's finding that the charge is not true, and therefore the EAB's decision must be affirmed for this reason as well.

¶104. This is a hard case with bad facts. The record contains a number of allegations that

---

[18] *See, e.g.*, *Fought v. Stuart C. Irby Co.*, 523 So. 2d 314, 317 (Miss. 1988) (explaining that a decision may be supported by substantial evidence—and must be affirmed—"even though the evidence would convince this Court otherwise, were we the fact finder").

[19] DPS could have avoided this legal problem by charging Richards with a different offense, such as conduct that is "plainly related to job performance" and that is "of such a nature that to continue [Richards] in [his] assigned position could constitute negligence in regard to the agency's duty to the public or . . . other state employees." General Order 9.03.04(B)(3)(k).

Sergeant Richards engaged in serious misconduct over a period of several years. But most of those allegations are irrelevant to the issues before us, and the trier of fact (the EAB) found that the relevant allegations were not true. Because the EAB's decision is supported by substantial evidence, it must be affirmed. In an effort to deal with some bad facts, the majority opinion makes a mess of our standard of review and undermines state service employees' statutory right to an appeal and a de novo hearing before the EAB. I respectfully dissent.

**LAWRENCE, J., JOINS THIS OPINION.**